## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **MOZIDO, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | Civil Action No. 16-675 |
| **v.** | § | |
| | § | |
| **STEVEN G. PAPERMASTER, BRIAN G.** | § | |
| **MAGIERSKI, APPCONOMY, INC.,** | § | |
| **APPCONOMY-US INC., NEUNANO** | § | |
| **CHINA CORP., BRIAN G. MAGIERSKI,** | § | |
| **IN HIS CAPACITY AS TRUSTEE FOR** | § | |
| **THE MAGIERSKI FAMILY TRUST,** | § | |
| **MOLI CAPITAL LLC (f/k/a 10X** | § | |
| **CAPITAL LLC), and GAIL** | § | |
| **PAPERMASTER, IN HER CAPACITY AS** | § | |
| **TRUSTEE FOR THE STEVEN G.** | § | |
| **PAPERMASTER 2014 TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Mozido, Inc. ("Mozido") files this Original Complaint against defendants Steven G. Papermaster ("Papermaster"), Brian G. Magierski ("Magierski"), Appconomy, Inc. ("App-Inc."), Appconomy-US, Inc. ("App-US"), Neunano China Corp. ("Neunano"), Brian G. Magierski in his capacity as Trustee for the Magierski Family Trust ("Magierski Trust"), MoLi Capital LLC, formerly known as 10X Capital LLC ("10X Capital"), and Gail Papermaster in her capacity as Trustee for the Steven G. Papermaster 2014 Trust ("Papermaster Trust") and respectfully shows the Court as follows:

## NATURE OF THE CASE

1.      Defendants, led by Papermaster, promised to provide Mozido, a leading global mobile payments platform provider, with substantial opportunities to expand into the Chinese market.   However, that promise turned out to be part of an intricate fraud that defendants perpetrated in order to swindle Mozido out of millions of dollars.

2.      To lure Mozido into their trap, defendants touted their contacts and presence in the Chinese market, representing that they had exclusive contracts with the owners of 477 shopping malls in China where Mozido's mobile payment products could be deployed.   Defendants also represented that they had an exclusive contract, as well as a close personal and business relationship with Neusoft, the largest provider of IT solutions and services in China, that would deliver 100 million new Chinese customers to Mozido.

3.       In attempting to convince Mozido that their fraudulent representations were in fact true, defendants went to extraordinary lengths, including forging the signature of Neusoft's Chairman and CEO on legally binding documents, and having an imposter pose as Neusoft's Chairman and CEO in a critical conference call with Mozido executives.   The defendants' elaborate scheme worked, and they ultimately convinced Mozido to lend them $6.5 million as part of the broader promised business relationship with Neusoft that they had no intention of repaying and for which they pledged functionally worthless collateral in the form of securities.

4.      When defendants failed to deliver on the promised commercial relationship with Neusoft, Mozido went directly to Neusoft to investigate.   It was only then that Mozido learned that Neusoft knew nothing of defendants' representations:  they were all blatant frauds, and that what Mozido had been led to believe were direct contacts with, and documents signed by, Neusoft, were

in fact complete fabrications. With their fraudulent conduct uncovered, defendants then proceeded to default on their loan commitments to Mozido, and the $6.5 million loan that was provided to defendants has come due without any payment from defendants whatsoever.

5.     Each of the defendants participated in the scheme to defraud Mozido, described in more detail in this Complaint.

6.     Accordingly, Mozido should be awarded compensatory and punitive damages for the harm defendants have caused through their wrongful and fraudulent actions.

## THE PARTIES

7.     Plaintiff Mozido is a Delaware corporation with its principal place of business in Travis County, Texas.

8.     Defendant Papermaster is an individual who resides in Travis County, Texas. Papermaster may be served with summons at 1300 Guadalupe Street, Suite 201, Austin, Texas 78746.

9.     Defendant Magierski is an individual who resides in Travis County, Texas. Magierski may be served with summons at 1300 Guadalupe Street, Suite 201, Austin, Texas 78746.

10.     Defendant App-Inc. is a Delaware corporation with its principal place of business in Travis County, Texas. App-Inc. may be served with summons by serving its officers, Steven G. Papermaster or Brian G. Magierski, at 1300 Guadalupe Street, Suite 201, Austin, Texas 78746. App-Inc. may also be served through its registered agent for service of process, C T Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201 and/or C T Corporation, 701 Brazos St. #360, Austin, Texas 78701.

11.     Defendant App-US is a Delaware corporation with its principal place of business in Travis County, Texas.  App-US may be served with summons by serving its officers, Steven G. Papermaster or Brian G. Magierski, at 1300 Guadalupe Street, Suite 201, Austin, Texas 78746. App-US may also be served through its registered agent for service of process, C T Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

12.     Defendant Neunano is a Delaware corporation with its principal place of business in Travis County, Texas.  Neunano may be served with summons by serving its officers, Steven G. Papermaster or Brian G. Magierski, at 1300 Guadalupe Street, Suite 201, Austin, Texas 78746. Neunano may also be served through its registered agent for service of process, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

13.     Defendant Magierski Trust is a trust with its principal place of business in Travis County, Texas.  The Magierski Trust may be served with summons by serving its Trustee, Brian G. Magierski, at 11 Niles Road, Austin, Texas 78703-3138.

14.     Defendant 10X Capital is a Texas limited liability company with its principal place of business in Travis County, Texas.  10X Capital may be served with summons by serving its Registered Agent, Brian G. Magierski, at 11 Niles Road, Austin, Texas 78703-3138.

15.     Defendant Papermaster Trust is a trust with its principal place of business in Travis County, Texas.  The Papermaster Trust may be served with summons by serving its Trustee, Gail Papermaster, at 1300 Guadalupe Street, Suite 201, Austin, Texas 78746.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 1367, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the securities markets.

19.     This Court has personal jurisdiction over defendants because they are all residents and/or citizens of Texas; because they engaged in business in Texas by contracting through the mail or otherwise with Mozido, a Texas resident; because the Loan Agreement and Pledge Agreement (as defined below) at issue in this case were negotiated and performable in Texas; and because the parties to the Loan Agreement and Pledge Agreement agreed that any litigation arising out of or relating to those agreements would be brought in Texas.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Defendants maintain their principal place of business in the District, the acts charged herein - including a substantial part of the events giving rise to the claims below - occurred in this District, and Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust have consented in writing to venue in this District.

## FACTS

### I.    Mozido Is a Mobile Financial Services Provider Seeking to Expand Into China

21.    Mozido, the first company in the United States to launch a mobile wallet, is a global mobile payments platform provider that, among other things, seeks to provide the roughly 2 billion people worldwide who do not have bank accounts, but do have mobile phones, with access to financial services through "mobile wallets" at lower fees than they currently have to pay.

22.    Mozido is recognized as a pioneer and global leader in cloud-based mobile financial services and commerce solutions, with operations in the United States, Mexico, Central America, the Caribbean, the Middle East, Africa, India, and Southeast Asia, and ongoing expansion into new markets.  Because Mozido's technology is secure and able to operate on any mobile platform, it offers the ideal solution for users around the globe.  Approximately 75 million consumers worldwide currently use the Mozido platform, and Mozido anticipates that number will grow substantially in 2016.

23.    In or about February 2014, Mozido began to extend its global reach into China by partnering with PayEase, a mobile payment processing firm that operates in China.  With 20% of the world's population and continuing explosive growth, China is a highly lucrative market for Mozido's products.  In 2013, China overtook the U.S. as the world's largest e-commerce market and is projected to be the largest overall retail market in the world by 2018.  As a result, Mozido has consistently focused its efforts on expanding its presence in China by seeking investment opportunities with strategic partners who already have a foothold in that market.

**II.**   **Defendants Claim to be Pioneers in the Future of Mobile Retailing in China**

24.   Defendants App-Inc., App-US, and Neunano (collectively, "Appconomy"), are software companies that collectively do business as Appconomy and hold themselves out as pioneers in the future of mobile retailing in China.  At all relevant times Papermaster and Magierski presented themselves as employees, directors, officers, representatives, and/or agents of Appconomy.  Appconomy, which was founded in 2010, purports to specialize in mobile marketing, shopping, and related applications.  According to its website, Appconomy builds branded applications for major retailers and brands that offer smart shopping lists, in-store navigation, targeted contextual promotions and alerts, loyalty programs, heat mapping, and dwell-time analysis.  Appconomy's premier application, known as Jinjin Marketplace, is supposed to connect merchants with consumers by allowing retailers, merchants, and brands to build Smartphone and tablet computer applications that include daily deals, coupons, rewards and loyalty programs, social network sharing, and mobile payments.  Appconomy counts Burger King and Pepper Lunch, which are major retailers in China, among its retail partners for the Jinjin Marketplace application.

25.   Appconomy purports to represent the best of American and Chinese innovation by acting as a dual U.S./Chinese company with significant operations and business in the U.S. and China.  Papermaster and Magierski and/or their affiliates are the principal owners, and Papermaster and Magierski are executive officers, of Appconomy.

26.   In its dealings with Mozido and others, defendants have touted a purported partnership with publicly traded Chinese software technology giant Neusoft.  Neusoft, which was founded in 1991 by Dr. Jiren Liu, is the largest provider of IT solutions and services in China and

7

employs more than 23,000 people worldwide.  In 1996, Neusoft became the first listed software company in China.  It holds valuable licenses that are required for Internet businesses in China but are very difficult for foreign companies like Mozido to obtain.

27.     Neusoft is the Chinese market share leader in IT solutions and comprehensive services and support for the administration of China's social security services, telecom (business support systems), energy, medical IT, trade logistics, and IT services, among other things.  It has over 100 million customers in China.  Neusoft's customer base also includes over 300 large global corporations, 50 Fortune Global 500 companies, 5,000 medical institutions around the world, 50 governmental organizations in China, and 50 state-owned key enterprises in China.  Its healthcare platform alone has served over 6 million people in China.

28.     Defendants claim that Neusoft is Appconomy's largest investor, as well as its "partner" in China.  Defendants also claim that by partnering with Neusoft, Appconomy was able to "piggyback" on Neusoft's Internet business licenses and, further, that Neusoft licensed its software to Appconomy.

## III.   Defendants Promise Mozido Entry into the China Market

29.     In 2014, shortly after Mozido first entered the Chinese market, Appconomy founder Papermaster approached Mozido about a potential merger or other business combination between Mozido and Appconomy, in which Mozido would acquire the stock or assets of Appconomy and certain of its affiliates.  On July 14, 2014, Mike Love, Mozido's CEO, spoke with Papermaster who represented that Alibaba, the world's largest online and mobile marketplace, had tried to acquire Appconomy for approximately $1 billion, but that Appconomy had rejected the

8

offer. Papermaster specifically referenced Alibaba's alleged offer to acquire Appconomy to entice Mozido to acquire Appconomy.

30.     Knowing that Mozido was seeking to expand its presence in China, defendants also touted Appconomy's connections to Neusoft as an inducement for Mozido to engage in such a transaction. Given Neusoft's prominent position in the Chinese market, Mozido had long sought to engage with Neusoft in order to diversify and expand the market for Mozido's products in China. However, Mozido had no independent connections with Neusoft, and Appconomy's purported close relationship with this prominent Chinese company promised to provide Mozido with broader access to the diverse and expansive Chinese market that it sought.

31.     On July 28, 2014, Michael Liberty, the founder of Mozido, met with Papermaster, John Galt, and Brian Kelly at the Fairmont Miramar Hotel in Santa Monica, California. Papermaster represented to Mozido, and on August 13, 2014 in Mozido's Austin office, Magierski confirmed, that: (a) Alibaba had offered to acquire Appconomy for $1 billion; (b) Appconomy and Neusoft were partners; (c) Appconomy, through its relationship with Dr. Liu, had obtained an exclusive contract with the largest owner of shopping malls in China, which covered 477 malls and where each mall received approximately 100,000 customers a day; (d) that Appconomy had exclusive contracts with the two largest Chinese telecommunications companies which covered 477 malls; (e) Neusoft and/or Dr. Liu had invested $17 million in Appconomy; and (f) as a result of Appconomy's relationship with Dr. Liu, Neusoft, and the largest Chinese shopping mall owner, Papermaster and Magierski could ensure that Neusoft would enter into an exclusive contract with Mozido for a 5% engagement fee. In short, Papermaster and Magierski represented that Appconomy could -- and would -- procure Neusoft's 100 million Chinese customers for Mozido.

9

32.     At the meeting, Papermaster also shared a video of the Chinese malls it allegedly had agreements with, which was later showed by Mozido to others.

33.     At the meeting, Papermaster touted that Appconomy wanted to do business with Mozido and had rejected Alibaba's offer because of Mozido's potential value, payment platform, licenses, and because it was interested in monetizing Mozido's patent-pending technology.

34.     On the following day, July 29, 2014, the meeting at the Fairmont Miramar Hotel in Santa Monica, California resumed and Papermaster repeated the representations to Michael Liberty that he had made the previous day.  Papermaster additionally represented that Appconomy could assist Mozido in its Series D financing by securing $400 million from Alibaba, Neusoft, Wanda, Tencent, and other important Chinese companies if Mozido agreed to invest in Appconomy.

## IV.   Defendants Fraudulently Induce Mozido to Loan them $6.5 Million

35.     Beginning in July 2014, in reasonable and justifiable reliance on Papermaster's representations, as confirmed by Magierski, Mozido began to work on the proposed acquisition of Appconomy by Mozido.  At all relevant times, the proposed transaction was based on, and induced by, defendants' repeated and explicit representations that they could and would provide Mozido with broad access to the Chinese market directly and through Neusoft and because of Papermaster's representations of Appconomy's value as evidenced by Alibaba's offer to acquire Appconomy.   If Mozido had known that Papermaster's representations, as confirmed by Magierski, were in fact false, which they are, it would not have considered acquiring Appconomy or engaging in any sort of business relationship with Appconomy.

36.     Papermaster asked Mozido to loan $6.5 million to Appconomy in order for Appconomy to expand its business while the acquisition transaction was being negotiated:  $5 million was to be earmarked for use in China to raise additional capital, and $1.5 million to purchase a license to use a Mozido software product in Chinese shopping malls.  Though structured as a loan, the expectations were that the character and nature of the loan would actually be an investment by Mozido in Appconomy so that Appconomy could secure additional funding from Chinese companies and continue its growth in the Chinese marketplace, which Mozido would directly benefit from through a later acquisition of Appconomy.

37.     On August 12, 2014, Papermaster participated in Mozido's Board of Directors meeting held in New York, at the Wilson Sonsini Goodrich & Rosati offices.  At the meeting, Papermaster made the same representations as he made at the July 28, 2014 meeting and asked Mozido's Board to appoint him to a leadership position within the company, specifically Chief Executive Officer.

38.     From July to November 2014, Papermaster and Magierski met with Mozido at Mozido's offices multiple times in an effort to convince Mozido to loan Appconomy the $6.5 million, continually making the misrepresentations referenced above.  Specifically, Papermaster and Magierski met with Mozido, including Mike Love and Michael Liberty, at Mozido's Austin office on October 21, 2014 and November 12, 2014, seeking for Mozido to acquire Appconomy. Papermaster made all of the same representations he made at the July 28, 2014 meeting, stressing his deep connections in China, that Alibaba offered to buy Appconomy for $1 billion, that Papermaster had a China-first company which was partnered with Neusoft, that Appconomy had a relationship with Chinese Telecom that covered Chinese malls, and Appconomy had an exclusive

contract with the largest owner of shopping malls in China which covered 477 malls.  Further, he stated that as a result of Appconomy's relationship with Dr. Liu, Neusoft, and the largest Chinese shopping mall owner, Papermaster could ensure that Neusoft would enter into an exclusive contract with Mozido.  These representations confirmed that Appconomy was expecting to benefit from Mozido's loan as an investment towards Appconomy's purported growth in the Chinese marketplace.

39.     After the initial meetings, Papermaster and Magierski repeatedly called Liberty asking Mozido to loan Appconomy $6.5 million to facilitate the China launch and to license Mozido's intellectual property to Appconomy in China.

40.     In July 2014 at Mozido's Austin office, Magierski represented to Mike Love, David Luther, and Mozido's management team that Appconomy's projected revenue for 2014 was $30 million.  However, by January 28, 2015, it was discovered that Appconomy's revenue during that time period was only $75,000.   Magierski knowingly and intentionally misrepresented Appconomy's projected revenue, knowing in July when the misrepresentation was made, that Appconomy could not feasibly meet its projection and that the representation was false.  Magierski made the misrepresentation to further induce Mozido into investing in and later acquiring Appconomy.  Further, Magierski provided no cautionary statement that the actual revenue could differ materially from the projected figure.

41.     In agreeing to invest in Appconomy, Mozido relied, reasonably and justifiably, on defendants' continued representations that Appconomy would provide Mozido with access to the Chinese market, primarily through Neusoft.   Mozido further relied on defendants' misrepresentations of Appconomy's value and correspondingly the value of the securities which

Appconomy pledged as collateral for a loan, specifically misrepresentations that Alibaba offered to acquire Appconomy for $1 billion, that Appconomy had valuable contracts with Chinese malls, and that it had achieved significant revenue based on actual performance.  In reliance on these false and misleading representations, Mozido agreed to loan $6.5 million to Appconomy secured by a pledge of Appconomy securities, whose value was grossly overstated by Appconomy.  The material misrepresentations were in connection with the purchase and sale of securities as Appconomy securities were pledged as collateral for the loan.  Had defendants not made these representations, Mozido would not have agreed to make the loan and would not have suffered the subsequent loss of the loan value, the represented value of the pledged securities, and the prospect of utilizing Appconomy and its connections to the Chinese marketplace to grow Mozido's international presence in the lucrative and mobile device-forward nation.

42.     On November 20, 2014, Mozido loaned $6.5 million to App-US for the express purpose of the development of App-US operations in China including "working capital and general business purposes, to cover the cost of technical improvements to App-US' current platform, and to support the further development of App-US' global network."  The terms of the loan are outlined in three documents: the Loan Agreement between Mozido and App-US dated as of November 20, 2014 (the "Loan Agreement"); the Pledge Agreement between Mozido and Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust dated as of November 20, 2014 (the "Pledge Agreement"), which sets forth the terms of the loan guarantee; and a Software Cross-Licensing and Distribution Agreement between Mozido and App-US dated as of December 15, 2014 (the "License Agreement"), which governs the terms of the software licensing portion of the loan amount.

13

43.     In the Loan Agreement, among other things, App-US agreed to: (a) repay the loan no later than November 1, 2015; (b) use the loan proceeds for specified purposes and to provide Mozido with certain reports and assurances as to App-US's financial condition and how the proceeds were being used, including quarterly financial reports, and reports describing App-US's intentions regarding use of the loan proceeds; (c) provide Mozido with an option to convert the loan into equity of App-US in the event that it issued equity securities; (d) not incur or assume certain liabilities or debt; and (e) in the event of default, in addition to Mozido's other remedies, grant Mozido a worldwide license to use App-US's products.  The Loan Agreement specifically defined certain events of default, including failure to pay principal and/or interest when due and failure to perform other obligations under the Loan Agreement, after notice and a specified cure period, and granted Mozido various additional remedies for default and failure to cure after notice, including the right to increase the applicable interest rate by 10%.

44.     The loan was secured by shares of App-US and App-Inc. pledged by Papermaster, Magierski, and the companies they were agents of and/or controlled, the Magierski Trust, 10X Capital, and the Papermaster Trust.  The Pledge Agreement between Mozido, as "Lender," and Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust, as "Pledgors," granted Mozido a security interest in 2.15 million shares of App-Inc. stock and approximately 1.39 million shares of App-US stock.  The Pledgors also agreed but failed to deliver to Mozido certificates evidencing their ownership of the collateral within 30 days.

45.     The loan was also conditioned on Mozido's receipt of App-US software licenses. The License Agreement provided, among other things, for Mozido rights in App-US licenses upon default under the Loan Agreement or Pledge Agreement.  Specifically, under Section 2.5 of the

License Agreement, App-US agreed that upon default under the Loan Agreement or the Pledge Agreement:

> Mozido shall automatically, without further action on the part of either party hereto, be granted an irrevocable, worldwide, fully-paid up, royalty-free, transferrable, perpetual, exclusive right and license under any and all Intellectual Property Rights, Technology and Deliverables owned (whether through acquisition or internal development or through other means), licensed or controlled by App-US to copy, distribute, display, perform, modify, make, use, sell, offer for sale, disclose, practice any process or method, import, export or otherwise dispose of and exploit any product, perform any services, and otherwise fully exploit such Intellectual Property Rights, Technology and/or Deliverables and to freely and fully sublicense such rights through multiple tiers.

Further, on December 15, 2014, App-Inc. gave Mozido its "unconditional consent" to the License Agreement.

46.     As required by the Loan Agreement, Mozido advanced the $6.5 million in loan proceeds to App-US in two tranches.  Mozido advanced the first tranche of $3.9 million on November 20, 2014, and the second tranche of $2.6 million on December 16, 2014.  As it turned out, defendants' representations that caused Mozido to invest in the first place and which Mozido relied on were entirely false.  The false statements, which were knowingly, intentionally, and/or recklessly made, were designed to deceive and mislead Mozido into believing that defendants could secure Mozido broad access to the Chinese markets through Appconomy's partnership with Neusoft, and that Appconomy, and its securities, were substantially more valuable than they actually were.

## V.    **Defendants' Fraudulent Scheme Expands, and is Exposed**

47.    Once App-US received the $6.5 million, defendants continued their attempt to extract large sums of money from Mozido by the promise of entry to the Chinese market through their purported partnership with Neusoft.

48.    On December 31, 2014, Papermaster arranged a conference call between Michael Liberty, Mozido's Chairman of Global Strategic Initiatives, Robert Turner, Mozido's executive chairman of the board, Mike Love, the CEO of Mozido, one of Mozido's largest investors, and a person who purported to be Neusoft Chairman and CEO Dr. Jiren Liu.  Prior to this teleconference, Mozido representatives had not previously met or spoken with Dr. Liu, and, based on Papermaster's representations, they believed that the person on the call actually was Dr. Liu. During the 55-minute long call, the purported Dr. Liu provided assurances regarding Neusoft's intent to do business with Mozido in the future and specifically agreed to provide Mozido with an exclusive contract for business in China.  Mozido asked the person with whom they spoke, and who they believed to be Dr. Liu, to provide Mozido with written assurance that Neusoft would enter into the exclusive contract with Mozido.

49.    Later that same day, as further evidence of Appconomy's claimed relationship with Neusoft, Papermaster provided Mozido with a "comfort letter," purportedly from Dr. Liu.  The comfort letter stated that Neusoft would provide an "equal level of commitment and partnership to Mozido as it had to Appconomy;" that Neusoft would "enter into a commercial agreement with Mozido . . . to be the exclusive payment processor and mobile commerce platform partner;" and that Neusoft would provide Mozido with access to "Neusoft customers and partners," as well as

Chinese markets in "healthcare, Xikang, education, social security, citizen services, transportation, and retail/consumer services."

50.     However, as more time passed without any significant progress in developing a commercial relationship with Neusoft, Mozido began to question the veracity of defendants' representations.  During due diligence in connection with the proposed Appconomy acquisition, Mozido identified serious shortcomings and inconsistencies in the information that Papermaster and Magierski had provided concerning Appconomy.   In early 2015, Mike Love of Mozido traveled to China with Papermaster on a fact finding mission.  During his trip, Mozido began to discover that defendants had lied about the extent of their Chinese business relationships.  On January 28, 2015, Mozido wrote to Papermaster and Magierski, complaining about the lack of progress that had been made toward securing key commercial relationships, including with Neusoft, that had been the "key focus" of the parties' discussions "since day 1."  Mozido pointed out that Papermaster and Magierski's representations of Appconomy's expected 2014 revenues were over 350 times (or 40,000%) lower than they actually were.  Mozido demanded "complete candor" in their discussions going forward.

51.     Papermaster was undaunted by Mozido's pressing inquiries and demand for candor. Continuing to provide Mozido with further "evidence" of Neusoft's commitment to Mozido, on February 23, 2015, Papermaster delivered to Mozido a Memorandum of Terms for Series D Preferred Stock Financing of Mozido, Inc. purportedly signed by "Dr. Liu Jiren" of Neusoft (the "Memorandum of Terms"), under which Neusoft proposed to invest $75 million in Mozido.  The Memorandum of Terms provided that Neusoft would invest the first $25 million on or before March 31, 2015, and the remaining $50 million would be consideration for a "strategic agreement"

that would provide "access to platform subscribers in China determined mutually between Mozido and Neusoft."

52.     Despite the delivery of the Memorandum of Terms, the commercial relationship between Mozido and Neusoft failed to materialize.  Frustrated with the lack of progress, in March 2015, Mr. Liberty flew to China in an effort to arrange a meeting with Dr. Liu.  However, Dr. Liu refused to meet with him.

53.     Mozido later learned that the Neusoft comfort letter, the phone call, and Memorandum of Terms were all fraudulent elements of defendants' elaborate scheme to defraud Mozido into paying them substantial sums of money.  After trying to meet with Dr. Liu in person in China, Mr. Liberty made contact with Angela Wang, the chief legal officer of Neusoft.  Ms. Wang claimed to know nothing about the New Years' eve conference call, comfort letter, the Memorandum of Terms or anything about Mozido or Mr. Liberty.  As the chief legal officer of Neusoft, Ms. Wang assured Mr. Liberty that Neusoft would not have signed the Memorandum of Terms without her knowledge.  Mr. Liberty then spoke at length with Dr. Liu and Ms. Wang and was assured that Dr. Liu did not participate in any conference calls with Liberty or Mozido and that Dr. Liu had never seen the comfort letter or Memorandum of Terms let alone approved either document.  The documents were forged, and defendants had enlisted an imposter to participate in the conference call as Dr. Liu.

54.     Further, Dr. Liu and Ms. Wang informed Mr. Liberty that Neusoft never agreed to provide Mozido with an exclusive contract and that it was not in a position to do so as a result of an existing contract with another large company in Mozido's line of business.

18

55.    Mr. Liberty and Mr. Love also learned that Alibaba had never offered to acquire Appconomy for $1 billion dollars; rather Alibaba had offered to purchase Neusoft for approximately $1 billion.  Further, they learned that it was Neusoft, not Appconomy who had the relationship with the real estate developer of the Chinese malls, and the malls did not total 477. These misrepresentations were used to entice Mozido into acquiring Appconomy and misrepresented Appconomy's and its securities true value.   The misrepresentations were made in connection with the purchase and sale of securities where, pursuant to the Pledge Agreement, Appconomy securities were pledged as collateral for Mozido's $6.5 million loan, and intentionally misrepresented the value of Appconomy's shares.

56.    Mozido also learned that Appconomy only had contracts with 4 shopping malls in China and not 477 malls as it had initially claimed.  Mozido also later learned that Appconomy did not have contracts with either of the two largest telecommunications companies in China for the 477 malls which it had also claimed.

57.    Mozido now understood what had been happening: defendants had knowingly fabricated a relationship and partnership with Neusoft and Chinese shopping mall owners in order to trick Mozido into believing that Appconomy and its shares were extremely valuable so as to obtain access to millions of dollars in investment financing from Mozido -- financing that defendants never had any ability, let alone intention, to repay.  Papermaster and Magierski acted with scienter and intended for the fabrications to deceive, manipulate, and/or defraud Mozido, and/or were deliberately reckless in their representations to Mozido which were highly unreasonable and an extreme departure from the standards of ordinary care.  Papermaster's and Magierski's statements regarding Appconomy's relationship with Neusoft and Chinese shopping

19

mall owners misrepresented the true value of the securities pledged as collateral for Mozido's $6.5 million loan because Papermaster and Magierski misrepresented and inflated the value of Appconomy's business and misrepresented the revenue Appconomy generated. Further, Papermaster and Magierski neglected to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Mozido reasonably and justifiably relied on these misrepresentations and omissions when it agreed to loan Appconomy $6.5 million, and these misrepresentations caused Mozido to loan Appconomy $6.5 million and accept Appconomy shares, whose value was misrepresented and grossly overstated, as collateral for the loan. Further, defendants intentionally deceived, manipulated, and defrauded Mozido by promising and subsequently failing to deliver to Mozido the pledged securities as collateral for the loan after Mozido funded the loan. But for defendants' misrepresentations, Mozido would not have agreed to loan Appconomy $6.5 million or agreed to accept the pledged securities as collateral. Had Mozido not uncovered Appconomy's fraud when it did, defendants would have continued to perpetuate their charade, and would have sought to induce Mozido into a fraudulent transaction that dwarfed the $6.5 million that already had fraudulently been obtained.

## VI.   **After Defendants' Fraud is Uncovered, They Refuse to Pay Back the $6.5 Million**

58.   Defendants' wrongdoing did not stop once the fraud was uncovered. After the scheme was revealed, App-US defaulted on the Loan Agreement after failing to perform any of its obligations thereunder, including the timely payment of principal and interest when the loan matured on November 1, 2015. Moreover, the Pledgors have violated the terms of the Pledge

Agreement by failing to deliver the collateral to Mozido as a result of App-US's default, causing Mozido to lose the value of its loan.

59.     On April 10, 2015, Mozido gave App-US and the Pledgors written notice of these defaults and demanded that App-US and the Pledgors cure the defaults within the time provided in the Loan Agreement (the "April 10, 2015 Demand Letter").  Specifically, in the April 10, 2015 Demand Letter, Mozido advised App-US and the Pledgors of their various breaches of the Loan Agreement and/or Pledge Agreement through: (i) App-US's consummation, without Mozido's consent, of an equity financing in violation of  Section 5.11(b) and Section 6.1(c) of the Loan Agreement; (ii) App-US's failure to deliver periodic financial and use reports, in violation of Sections 5.3, 5.13, and Section 6.1(c) of the Loan Agreement; (iii) App-US's failure to deliver monthly Sources and Uses Reports for December of 2014, and for January, February and March 2015 in violation of Section 5.13 and Section 6.1(c) of the Loan Agreement; and (iv) App-US and the Pledgor's failure to deliver all share certificates or instruments representing or evidencing the pledged collateral accompanied by duly executed instruments of transfer or assignments in blank, as required under Section 6.1(c) of the Loan Agreement and Section 3 of the Pledge Agreement. Mozido further advised App-US and the Pledgors that as a result of these events of default: (i) App-US had granted Mozido an irrevocable, worldwide, fully-paid up, royalty free, transferrable, perpetual, exclusive right and license under any and all Intellectual Property Rights, Technology and Deliverables, owned licensed or controlled by App-US, pursuant to Section 2.9 of the Loan Agreement and Section 2.5 of the License Agreement; (ii) the interest rate has been increased from 4% to 14%, pursuant to Section 7.1(d) of the Loan Agreement; (iii) pursuant to Section 6(b) and Section 8 of the Pledge Agreement, all rights to receive interest, dividends and distributions on the

pledged collateral have vested in Mozido and must be held in trust and segregated by App-US and immediately paid over to Mozido as additional pledged collateral.  App-US and the Pledgors failed and refused to cure the defaults.

60.     On June 17, 2015, Mozido gave App-US and the Pledgors written notice of additional and/or continuing defaults and demanded that App-US and the Pledgors cure the defaults within the time provided in the Loan Agreement.  Specifically, Mozido again advised App-US and the Pledgors that they had breached the Loan Agreement and/or Pledge Agreement in the manner described in the April 10, 2015 Demand Letter and that they were continuing to breach those agreements under: (i) Section 5.3 and Section 6.1(c) of the Loan Agreement by failing to deliver quarterly Financial Reports for the period ending March 31, 2015; (ii) Section 5.13 and Section 6.1(c) of the Loan Agreement by failing to deliver monthly Sources and Uses Reports for April and May 2015; and (iii) Section 5.14 and Section 6.1(c) of the Loan Agreement and Section 5(a) of the Pledge Agreement by failing to comply with the April 10, 2015 Demand Letter by delivering the pledged collateral, financial statements and sources and uses reports specified therein.  App-US and the Pledgors again failed and refused to cure the defaults and have continued to default since that time by failing and refusing to deliver any of the quarterly Financial Reports, Sources and Uses Reports or the pledged collateral which they contractually agreed to provide to Mozido.

61.     The loan matured on November 1, 2015.  App-US did not repay the loan at maturity or thereafter.  Pursuant to Section 6.1(a) of the Loan Agreement, the "fail[ure] to pay any principal or interest as and when required by [the] Loan Agreement" constitutes an Event of Default for which there is no right to cure under the Loan Agreement.  Pursuant to Section 7.1 of the Loan

Agreement, the entire unpaid balance of the loan is immediately due and payable. Defendants have not paid any portion thereof since the loan default or maturity, despite being obligated under the Loan Agreement to repay all of those fraudulently-obtained funds.

## FIRST CAUSE OF ACTION

### Violation of Federal Securities Exchange Act of 1934
### (Against all Defendants)

62.     Mozido repeats and realleges the allegations of paragraphs 1 through 61 as if set forth fully herein.

63.     This Count is asserted against all defendants and is based upon Section 10(b) of the Federal Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.

64.     The pledge of Appconomy shares as collateral for Mozido's $6.5 million loan to Appconomy and evidenced by the Pledge Agreement is a purchase and sale of securities, and Mozido is a purchaser of securities, for purposes of 15 U.S.C. § 78j and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.

65.     Defendants, in connection with this purchase and sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, directly and indirectly: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon Mozido, as more particularly described above.

66.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud, made untrue statements of material facts, omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in fraudulent acts, practices, and courses of business.  In engaging in such conduct, defendants acted with scienter, that is, they acted with an intent to deceive, manipulate, or defraud Mozido or acted with a severely reckless disregard for the truth.  Defendants knowingly, intentionally, and/or recklessly made false and misleading statements, including representations that Appconomy would provide Mozido with access to the Chinese market, primarily through its relationship with Neusoft; Appconomy was partners with Neusoft; Appconomy through its relationship with Dr. Liu had obtained an exclusive contract with the largest owner of shopping malls in China, which covered 477 malls and where each mall received approximately 100,000 customers a day; that Appconomy had exclusive contracts with the two largest Chinese telecommunications companies which covered 477 malls; Neusoft and/or Dr. Liu had invested $17 million in Appconomy; and as a result of Appconomy's relationship with Dr. Liu, Neusoft, and the largest Chinese shopping mall owner, defendants could ensure that Neusoft would enter into an exclusive contract with Mozido for a 5% engagement fee. Further, defendants knowingly, intentionally, and/or recklessly made false and misleading statements about Appconomy's value and the value of its pledged securities, including representations that Alibaba had offered to acquire Appconomy for $1 billion and that its revenue for 2014 would be $30 million based on months of actual financial data, when it was later discovered that Appconomy's revenue was $75,000.

67.    By reason of the foregoing, defendants directly and indirectly violated Section 10(b) of the Federal Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.

68.    Defendants' misrepresentations were intentionally or severely reckless and done for the purpose of defrauding and misleading Mozido.  Mozido would not have agreed to loan Appconomy $6.5 million, accepted Appconomy shares as collateral for the loan and/or entered into the Pledge Agreement if it had been aware that defendants' representations were false.

69.    As a direct and proximate result of defendants' wrongful conduct, Mozido, who reasonably relied on defendants' statements and but for those statements would not have so acted, suffered damages in connection with the $6.5 million loan Mozido made to Appconomy, and the lost value of the shares pledged as collateral for the loan, in an amount to be proven at trial.  Further, Mozido suffered damages as a result of defendants' failure to deliver to Mozido the pledged securities pursuant to the Pledge Agreement.

70.    Alternatively, Papermaster and Magierski, in their roles as officers, directors, executives, controlling shareholders, managers, and/or owners of App-Inc., App-US, Neunano, Magierski Trust, 10X Capital, and the Papermaster Trust, were "control persons" of App-Inc., App-US, Neunano, Magierski Trust, 10X Capital, and the Papermaster Trust, causing or exerting, or possessing the power to cause and exert, power and influence on them, directly or indirectly, to issue the securities to Mozido and specifically participated in their issuance.  Papermaster and Magierski's actions violated the Section 20(a) of the Federal Securities Exchange Act of 1934, and as control persons are jointly and severally liable for the remaining defendants' direct violations

of Section 10(b) of the Federal Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.

71.     This action was filed within two years after Mozido's discovery of facts constituting defendants' violation.

72.     At all times herein, Papermaster and/or Magierski were acting on behalf of and were employees, directors, officers, representatives, agents and/or were controlled by App-Inc, App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust.  Therefore, App-Inc, App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust are liable to Mozido based on the doctrine(s) of respondeat superior and/or vice-principal.

## SECOND CAUSE OF ACTION

### Violation of Texas Securities Act Articles 581-33A(2) and/or 581-33F(1)-(2)
### (Against all Defendants)

73.     Mozido repeats and realleges the allegations of paragraphs 1 through 72 as if set forth fully herein.

74.     The Loan Agreement and pledge of Appconomy shares as collateral for Mozido's $6.5 million loan to Appconomy, evidenced by the Pledge Agreement, is a purchase and sale of securities under the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-1 *et seq*. because they constitute, among other things, a "note," "bond," "commercial paper," "mortgage certificate," "other evidence of indebtedness," "certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company," "investment contract," and/or "any other instrument commonly known as a security," as those terms are used in the definition of "security" or "securities" set forth in section 4A of the Texas Securities Act.

75.     Defendants, motivated by the financial gain they would receive through their deception in obtaining a windfall on the $6.5 loan from Mozido that they had no intention of ever repaying and pledged functionally worthless collateral for, offered for sale and sold securities within the State of Texas.

76.     As described herein, defendants violated the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-33A(2), by offering, soliciting, and/or selling securities by means of untrue statements of material facts and omissions to state material facts in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

77.     Specifically, as set forth above, defendants knowingly, intentionally, and/or recklessly made false and misleading material statements, including representations that Appconomy would provide Mozido with access to the Chinese market, primarily through its relationship with Neusoft; Appconomy was partners with Neusoft; Appconomy through its relationship with Dr. Liu had obtained an exclusive contract with the largest owner of shopping malls in China, which covered 477 malls and where each mall received approximately 100,000 customers a day; that Appconomy had exclusive contracts with the two largest Chinese telecommunications companies which covered 477 malls; Neusoft and/or Dr. Liu had invested $17 million in Appconomy; and as a result of Appconomy's relationship with Dr. Liu, Neusoft, and the largest Chinese shopping mall owner, defendants could ensure that Neusoft would enter into an exclusive contract with Mozido for a 5% engagement fee.  Further, defendants knowingly, intentionally, and/or recklessly made false and misleading material statements about Appconomy's value and the value of its pledged securities, including representations that Alibaba had offered to acquire Appconomy for $1 billion and that its revenue for 2014 would be $30

million based on months of actual financial data, when it was later discovered that Appconomy's revenue was $75,000.

78.     Any reasonable investor would consider these misstatements and omissions material, and Mozido would not have invested in the securities had it known the truth of foregoing misstatements and omissions beforehand.

79.     Alternatively, Papermaster and Magierski, in their roles as officers, directors, executives, controlling shareholders, managers, and/or owners of App-Inc., App-US, Neunano, Magierski Trust, 10X Capital, and the Papermaster Trust, were "control persons" of App-Inc., App-US, Neunano, Magierski Trust, 10X Capital, and the Papermaster Trust, causing or exerting power and influence on them to issue the securities to Mozido and specifically participated in their issuance.  Papermaster and Magierski's actions violated the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-33F(1), and as control persons are jointly and severally liable for the remaining defendants' direct violation of the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-33A(2).

80.     Alternatively, Papermaster and Magierski aided and abetted App-Inc., App-US, Neunano, Magierski Trust, 10X Capital, and the Papermaster Trust's direct violation of the Texas Securities Act.  Papermaster and Magierski specifically participated in this violation by, among other things, directing App-Inc., App-US, Neunano, Magierski Trust, 10X Capital, and the Papermaster Trust to issue the securities to Mozido.  Papermaster and Magierski's actions violated the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-33F(2), directly or indirectly, with the intent to deceive or defraud and with reckless disregard for the truth or the law, aided and gave substantial assistance in the remaining defendants' sale of securities in the State of Texas, and are jointly and

severally liable for the remaining defendants' violation of the Texas Securities Act, Tex. Rev. Stat. Art. 581-33A(2).

81.    Further, Papermaster and Magierski knew that material misrepresentations were made or omitted, as set forth previously herein, in an effort to induce Mozido into entering into the Loan Agreement, which, if given the benefit of knowing the truth of these material misrepresentations and omissions beforehand, it would not have entered.

82.    Mozido is therefore entitled to damages from defendants to the full extent permitted under the Texas Securities Act and all applicable law in an amount to be determined at trial.

83.    At all times herein, Papermaster and/or Magierski were acting on behalf of and were employees, directors, officers, representatives, agents and/or were controlled by App-Inc, App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust.  Therefore, App-Inc, App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust are liable to Mozido based on the doctrine(s) of respondeat superior and/or vice-principal.

## THIRD CAUSE OF ACTION

### Fraud and/or Fraudulent Inducement
### (Against all Defendants)

84.    Mozido repeats and realleges the allegations of paragraphs 1 through 83 as if set forth fully herein.

85.    Defendants Papermaster and Magierski, individually and as agents of App-Inc., App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust made numerous promises, misrepresentations of material facts, and omissions to Mozido during the discussions and negotiations leading up to the execution of the Loan Agreement, and the Pledge Agreement

and during the term of the Loan Agreement, and the Pledge Agreement with no ability or intention to act upon or deliver upon those promises.  Defendants also failed to disclose certain material facts to Mozido during the discussions and negotiations leading up to the Loan Agreement, and the Pledge Agreement and during the term of the Loan Agreement, and the Pledge Agreement with the intention of misleading Mozido.

86.     Such promises, misrepresentations and failures to disclose by defendants were knowingly false or, alternatively, were asserted without knowledge of their truth, and were made wrongfully in order to induce Mozido to enter into the Loan Agreement and the Pledge Agreement, and with the intent that Mozido rely upon such promises.  Mozido justifiably relied upon such promises, misrepresentations, and omissions thereby subjecting defendants to joint and several liability for this misconduct.

87.     As a direct result of defendants' fraudulent conduct, Mozido sustained damages in an amount to be determined by the trier of fact.

88.     In addition, because defendants' actions were committed knowingly, willfully and in conscious disregard of Mozido's rights, Mozido is entitled to recover punitive damages in an amount to be determined by the trier of fact.

89.     At all times herein, Papermaster and/or Magierski were acting on behalf of and were employees, directors, officers, representatives, agents and/or were controlled by App-Inc, App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust.  Therefore, App-Inc, App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust are liable to Mozido based on the doctrine(s) of respondeat superior and/or vice-principal.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation
### (Against all Defendants)

90.     Mozido repeats and realleges the allegations of paragraphs 1 through 89 as if set forth fully herein.

91.     Defendants Papermaster and Magierski, individually and as agents of App-Inc., App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust made numerous misrepresentations of material facts and provided false information to Mozido during the discussions and negotiations leading up to the Loan Agreement, and the Pledge Agreement and during the term of the Loan Agreement, and the Pledge Agreement and did not exercise reasonable care or competence in obtaining or communicating the information.

92.     Such misrepresentations and false information were provided by defendants to induce Mozido to enter into the Loan Agreement, and the Pledge Agreement and Mozido reasonably relied upon such misrepresentations and false information in entering into the Loan Agreement, and the Pledge Agreement.

93.     As a direct result of defendants' negligent misrepresentations, Mozido sustained damages in an amount to be determined by the trier of fact.

94.     In addition, because defendants' actions were committed knowingly, willfully and in conscious disregard of Mozido's rights, Mozido is entitled to recover punitive damages in an amount to be determined by the trier of fact.

95.     At all times herein, Papermaster and/or Magierski were acting on behalf of and were employees, directors, officers, representatives, agents and/or were controlled by App-Inc,

31

App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust.  Therefore, App-Inc,

App-US, Neunano, Magierski Trust, 10X Capital and/or Papermaster Trust are liable to Mozido

based on the doctrine(s) of respondeat superior and/or vice-principal.

## FIFTH CAUSE OF ACTION

### Breach of Contract
### (Against App-US)

96.     Mozido repeats and realleges the allegations of paragraphs 1 through 95 as if set

forth fully herein.

97.     The Loan Agreement that Mozido and App-US executed is a valid, binding and

enforceable contract.

98.     Mozido has performed, and continues to perform, all conditions, duties, obligations

and promises required on its part to be performed in accordance with the terms and conditions of

the Loan Agreement.

99.     All conditions precedent to Mozido's entitlement to recover under the Loan

Agreement have been performed, have occurred or have been waived.  Mozido performed its

obligations under the Loan Agreement by funding the $6.5 million amount and demanding

repayment thereof.

100.     Mozido is the proper party to enforce the Loan Agreement.

101.     As described in detail above, App-US has breached the Loan Agreement in

numerous ways, including failing to pay any principal or interest on the loan.  As a direct result of

its breach, Mozido sustained damages in an amount to be determined by the trier of fact.

## SIXTH CAUSE OF ACTION

**Breach of Contract
(Against Papermaster, Magierski, the Magierski Trust,
10X Capital, and the Papermaster Trust)**

102.    Mozido repeats and realleges the allegations of paragraphs 1 through 101 as if set forth fully herein.

103.    The Pledge Agreement that Mozido and Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust executed is a valid, binding and enforceable contract.

104.    Mozido has performed, and continues to perform, all conditions, duties, obligations and promises required on its part to be performed in accordance with the terms and conditions of the Pledge Agreement.

105.    All conditions precedent to Mozido's entitlement to recover under the Pledge Agreement have been performed, have occurred or have been waived.  Mozido performed its obligations under the Pledge Agreement by funding the $6.5 million amount and demanding repayment thereof.

106.    Mozido is the proper party to enforce the Pledge Agreement.

107.    As described in detail above, Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust have breached the Pledge Agreement.  As a direct and proximate result of their breach, Mozido sustained damages in an amount to be determined by the trier of fact.

108.    Mozido is also entitled to specific performance of the Pledge Agreement. Accordingly, the court should order Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust to deliver the collateral to Mozido.

109.    Alternatively, Mozido is entitled to recover from Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust, respectively, damages measured by the value of the collateral on the date the Pledgors were required to deliver same.

## SEVENTH CAUSE OF ACTION

### Declaratory Judgment
### (Against App-US, Papermaster, Magierski, the Magierski Trust, 10X Capital, and the Papermaster Trust)

110.    Mozido repeats and realleges the allegations of paragraphs 1 through 109 as if set forth fully herein.

111.    Mozido petitions the Court pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201-2202, Federal Rule of Civil Procedure 57 and Chapter 37 of the Civil Practice and Remedies Code of Texas, for a construction of the Loan Agreement that App-US defaulted under: (i) Section 5.11(b) and Section 6.1(c) of the Loan Agreement as a result of App-US's consummation, without Mozido's consent, of an equity financing between December 22, 2014 and January 6, 2015, as such transaction is described in a Notice of Exempt Offering of Securities filed with the U.S. Securities and Exchange Commission on January 6, 2015; (ii) Section 5.3 and Section 6.1(c) of the Loan Agreement by failing to deliver quarterly Financial Reports beginning with the period ending September 30, 2014 and continuing through the present date; and (iii) Section 5.13 and Section 6.1(c) of the Loan Agreement for failure to delivery monthly Sources and Uses Reports beginning on December of 2014, and continuing through the present date.

112.    Mozido further petitions the Court pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201-2202, Federal Rule of Civil Procedure 57 and Chapter 37 of the Civil Practice and Remedies Code of Texas, for a construction of the Loan Agreement that: (i) pursuant to Section 2.9 of the Loan Agreement, Mozido is granted an irrevocable, worldwide, fully-paid up, royalty-free, transferrable, perpetual, exclusive right and license under any and all Intellectual Property Rights, Technology and Deliverables owned (whether through acquisition or internal development or through other means), licensed or controlled by App-US to copy, distribute, display, perform, modify, make, use, sell, offer for sale, disclose, practice any process or method, import, export or otherwise dispose of and exploit any product, perform any services, and otherwise fully exploit such Intellectual Property Rights, Technology and/or Deliverables and to freely and fully sublicense such rights through multiple tiers; and (ii) pursuant to Section 7.1(d) of the Loan Agreement, the interest rate on Mozido's loan to App-US has been increased from 4% to 14%.

113.    Mozido further petitions the Court pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201-2202, Federal Rule of Civil Procedure 57 and Chapter 37 of the Civil Practice and Remedies Code of Texas, for a construction of the Loan Agreement, and the Pledge Agreement that App-US, Papermaster, Magierski, the Magierski Trust, 10X Capital and/or the Papermaster Trust defaulted  under Section 6.1(c) of the Loan Agreement and Section 3 of the Pledge Agreement for failure to deliver all share certificates or instruments representing or evidencing the pledged collateral accompanied by duly executed instruments of transfer or assignments in blank.

114.     Mozido further petitions the Court pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201-2202, Federal Rule of Civil Procedure 57 and Chapter 37 of the Civil Practice and Remedies Code of Texas, for a construction of the Pledge Agreement that (i) legal title to all pledged shares of stock and other equity interests have vested in Mozido, to the exclusion of the pledgors; and/or (ii) pursuant to Section 6(b) and Section 8 of the Pledge Agreement, all rights to receive interest, dividends and distributions on the pledged collateral have vested in Mozido and must be held in trust and segregated by App-US and immediately paid over to Mozido as additional pledged collateral.

115.     Mozido further petitions the Court pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201-2202, Federal Rule of Civil Procedure 57 and Chapter 37 of the Civil Practice and Remedies Code of Texas, for a declaration that: (i) App-US was the first materially breaching party under the Loan Agreement; and (ii) Papermaster, Magierski, the Magierski Trust, 10X Capital and/or the Papermaster Trust were the first materially breaching parties under the Pledge Agreement.

116.     Mozido further petitions the Court pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201-2202, Federal Rule of Civil Procedure 57 and Chapter 37 of the Civil Practice and Remedies Code of Texas, for a declaration that Mozido complied with the Loan Agreement and/or the Pledge Agreement in all material respects.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment
### (Against all Defendants)

117.    Mozido repeats and realleges the allegations of paragraphs 1 through 116 as if set forth fully herein.

118.    The defendants will be unjustly enriched if allowed to retain the $6.5 million which Mozido paid under the Loan Agreement, and the collateral pledged under Pledge Agreement because Mozido entered into those agreements with the expectation of being repaid and of gaining entry, through Neusoft, into the China market.  However, in furtherance of their scheme to defraud Mozido, the defendants absconded with Mozido's $6.5 million payment and the pledged collateral and did not deliver on their promise to secure entry into the China market through Neusoft.

119.    As a direct and proximate result of defendants' conduct, Mozido sustained damages in an amount to be determined by the trier of fact.

## NINTH CAUSE OF ACTION

### Conspiracy
### (Against all Defendants)

120.    Mozido repeats and realleges the allegations of paragraphs 1 through 119 as if set forth fully herein.

121.    Defendants conspired with one another to defraud Mozido, as more fully described above.  The objective of the conspiracy was to unlawfully overstate the value of Appconomy's business and securities to secure a loan and to abscond with Mozido's $6.5 million payment.

Defendants had a meeting of the minds on their objective, committed overt acts in furtherance of their objective, and proximately caused Mozido to sustain damages as a result thereof.

122.     As a direct and proximate result of defendants' conduct, Mozido sustained damages in an amount to be determined by the trier of fact for which defendants are jointly and severally liable.

## STATUTORY RIGHT TO ATTORNEY'S FEES

123.     Mozido repeats and realleges the allegations of paragraphs 1 through 122 as if set forth fully herein.

124.     As a direct result of the conduct of defendants as described above, Mozido has found it necessary to retain the law firm of Kasowitz, Benson, Torres & Friedman LLP to bring this action on its behalf, and has agreed to pay the firm its reasonable and necessary attorney's fees.  In accordance with 22 U.S.C. § 2201-2202, Rule 57 of the Federal Rules of Civil Procedure, Sections 37.001 and 38.001 et seq. of the Texas Civil Practice and Remedies Code, said law firm has presented Mozido's claim to defendants.  Therefore, pursuant to 22 U.S.C. § 2201-2202, Rule 57 of the Federal Rules of Civil Procedure, and Sections 37.001 et seq. and 38.001 et seq. of the Civil Practice and Remedies Code, Mozido is entitled to recover its reasonable attorney's fees incurred in connection with its prosecution of this lawsuit.

## JURY DEMAND

125.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mozido hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Mozido requests that defendants be cited to appear and timely answer hereof and seeks judgment against the defendants, jointly and severally, as follows:

1.      For its actual, economic, consequential, punitive and/or exemplary damages in an amount to be determined at the time of trial;

2.      That the Court construe the Loan Agreement and the Pledge Agreement and render the declaratory judgment requested above;

3.      For its reasonable attorney's fees and prejudgment and/or post-judgment interest;

4.      For its costs of court; and

5.      For such other and further relief, general or special, whether at law or in equity, to which it may show itself justly entitled.


Respectfully submitted,

By:  /s/ Constantine Z. Pamphilis
        Constantine Z. Pamphilis
        State Bar No. 00794419
        Email: Dpamphilis@kasowitz.com
        KASOWITZ, BENSON, TORRES
            & FRIEDMAN LLP
        700 Louisiana Street, Suite 2200
        Houston, Texas 77002-2730
        Telephone: (713) 220-8800
        Facsimile: (713) 222-0843

        ATTORNEYS FOR PLAINTIFF
        MOZIDO, INC.