IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | | |
|---|---|---|
| MOZIDO, INC., | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. A-16-CA-0675-LY |
| | § | |
| STEVEN G. PAPERMASTER, | § | |
| BRIAN G. MAGIERSKI, | § | |
| APPCONOMY, INC., | § | |
| APPCONOMY-US, INC., | § | |
| NEUNANO CHINA CORP., | § | |
| BRIAN G. MAGIERSKI, IN HIS | § | |
| CAPACITY AS TRUSTEE FOR | § | |
| THE MAGIERSKI FAMILY TRUST, | § | |
| MOLI CAPITAL LLC (F/K/A 10X | § | |
| CAPITAL LLC), AND | § | |
| GAIL PAPERMASTER, IN HER | § | |
| CAPACITY AS TRUSTEE FOR THE | § | |
| STEVEN G. PAPERMASTER | § | |
| 2014 TRUST, | § | |
| DEFENDANTS. | § | |

## ORDER DENYING MOTIONS TO DISMISS

Before the court is the above styled and numbered cause in which Plaintiff Mozido, Inc.

alleges claims of securities fraud under federal and Texas law, as well as tort claims of fraud,

fraudulent inducement, negligent misrepresentation, breach of contract, conspiracy, and unjust

enrichment against nondiverse Defendants. Pending in the action are Defendants' Rule 12(b)(1) and

12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Brief in Support filed October 4,

2016 (Clerk's Document No. 11), Plaintiff's Response to Defendants' Rule 12(b)(1) and 12(b)(6)

Motion to Dismiss Plaintiff's Amended Complaint and Brief in Support filed October 17, 2016

(Clerk's Document No. 12), and Defendants' Reply to Plaintiff's Response to Defendants' Rule

12(b)(1) and 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Brief in Support filed

October 24, 2016 (Clerk's Document No. 13). Also pending are Defendants' Motion to Dismiss Plaintiff's Amended Complaint for *Forum Non Conveniens* and Brief in Support filed November 9, 2016 (Clerk's Document No. 18), Plaintiff's Response to Defendants' Motion to Dismiss the Amended Complaint for *Forum Non Conveniens* and Brief in Support filed November 23, 2016 (Clerk's Document No. 19), and Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Amended Complaint for *Forum Non Conveniens* and Brief in Support filed November 30, 2016 (Clerk's Document No. 20). On March 21, 2017, the court held a hearing on the motions at which all parties were represented by counsel.

**Allegations in amended complaint[1]**

Mozido is a Delaware corporation, with its principal place of business in Travis County, Texas, that provides cloud-based mobile financial services.[2] Among the services Mozido offers are

---

[1] These allegations from Mozido's Plaintiff's Amended Complaint filed September 20, 2016, are presumed true for purposes of the motions to dismiss. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[2] According to Mozido's Amended Complaint,

> Mozido is the first company in the United States to launch a mobile wallet, is a global mobile payments platform provider that, among other things, seeks to provide the roughly 2 billion people worldwide who do not have bank accounts, but do have mobile phones, with access to financial services through "mobile wallets" at lower fees than they currently have to pay.

Mobile payments are generally considered as those purchases, bill payments, charitable donations, payments to another person, or any other payments made using a mobile phone. This includes using a mobile phone to pay for something in a store as well as payments made through an app, a mobile web browser, or a text message. Mobile payments are most commonly funded using debit cards, credit cards, directly from a bank account, or from an account at a non-financial institution such as PayPal. Convenience is the most common reason for using mobile payments. *See* Consumer & Community Dev. Research Sec., Fed. Reserve Bd.'s Div. of Consumer & Community Affairs, Board of Governors, Fed. Reserve Sys., *Consumers & Mobile Financial Servs.*,

"mobile wallets," which provide individuals who have mobile phones but no bank accounts access to financial services.  Defendants App-Inc., Appconomy-US, and Neuano are related software companies, whose principal places of business are Travis County, Texas, that collectively do business as "Appconomy" and specialize in mobile marketing, shopping, and related applications.[3] Defendants Steven Papermaster and Brian Magierski are residents of Travis County, Texas, as are their respective trusts, and are employees, directors, officers, representatives, or agents of Appconomy.

In February 2014, Mozido partnered with PayEase, a mobile payment-processing firm that operates in China.  After Mozido entered the Chinese market, Papermaster approached Mozido about a potential merger or other business arrangement whereby Mozido would acquire stock or assets of Appconomy.  In July 2014, Mozido retained two prominent law firms to conduct due diligence regarding Appconomy and to serve as Mozido's counsel in any transaction that might result with Appconomy.

On July 14, 2014, Mozido's Chief Executive Officer, Mike Love, spoke with Papermaster. Papermaster represented to Love that Alibaba, the world's largest online and mobile marketplace, had attempted to acquire Appconomy for $1 billion dollars, but that Appconomy had rejected the offer.  Papermaster also "touted Appconomy's connections to Neusoft[,]"which was founded by Dr. Jiren Liu, and is the largest provider of IT solutions and services in China.  Neusoft holds valuable licenses that are required for Internet businesses operating in China, but are difficult for foreign

_____

March 2016, 15-19 (2016) (available online www.federalreserve.gov/publications/default.htm).

[3] Because Defendants App-Inc., Appconomy-US, and Neuano's interests are aligned, they are referred to collectively as "Appconomy" unless otherwise indicated.

companies to obtain. Mozido had no independent connections with Neusoft, and Appconomy's "purported close relationship with this prominent Chinese company promised to provide Mozido with broader access to the diverse and expansive Chinese market that it sought."

On July 28, 2014, Michael Liberty, the founder of Mozido, met with Papermaster, John Galt, and Brian Kelly, in Santa Monica, California. At that meeting, Papermaster represented to Liberty, and, later on August 13, 2014, in Mozido's Austin office, Magierski confirmed that: (1) Alibaba had offered to acquire Appconomy for $1 billion dollars; (b) Appconomy and Neusoft were partners; (c) Appconomy, through its relationship with Liu, had obtained an exclusive contract with the largest owner of shopping malls in China, which covered 477 malls and where each mall received approximately 100,000 customers a day; (d) Appconomy had exculsive contracts with the two largest Chinese telecommunications companies; (e) Neusoft or Liu had invested $17 million in Appconomy; and (f) as a result of Appconomy's relationship with Liu, Neusoft, and the largest Chinese shopping mall owner, Papermaster and Magierski could ensure that Neusoft would enter into an exclusive contract with Mozido for a 5% engagement fee.

On July 29, 2014 Papermaster repeated these representations to Liberty, and additionally represented that Appconomy could assist Mozido with financing by securing $400 million from Alibaba, Neusoft, and other important Chinese companies if Mozido agreed to invest in Appconomy.

Papermaster proposed that Mozido loan $6.5 million dollars to Appconomy so that Appconomy could expand its business while an acquisition transaction was negotiated with Mozido. $5 million dollars was to be earmarked for use in China to raise additional capital, and $1.5 million dollars was to be used to purchase a license to use a Mozido software product in Chinese shopping malls. Although structured as a loan, the parties' expectations were that the character and nature of

the proceeds would actually be an investment by Mozido in Appconomy. The transaction would aid Appconomy in securing additional funding from Chinese companies so that Appconomy could continue to grow in the Chinese marketplace, with the result that, when Mozido acquired Appconomy, Mozido would benefit from Appconomy's ongoing growth in China.

On August 12, 2014, Papermaster participated in Mozido's Board of Directors meeting and at the meeting Papermaster made the same representations he made at the July 28, 2015 meeting in California and asked the Mozido board to appoint him Chief Executive Officer of Mozido. Between August and November 2014, Appconomy provided a virtual data room populated with Appconomy corporate formation documents and financial statements for Mozido's counsel's to review in conducting their due diligence review of Appconomy.

On November 20, 2014, Mozido loaned Appconomy $6.5 million for the purpose of developing Appconomy-US's operations in China. The parties executed three documents: (1) a Loan Agreement between Appconomy-US and Mozido, dated November 20, 2014, and signed by Collateral Guarantors, Mozido, and Appconomy-US, Inc.;[4] (2) a Pledge Agreement dated November 20, 2014, and signed by the "Lender"–Mozido–and signed by each of the "Pledgors"–the Collateral Guarantors under the Loan Agreement; and (3) a Software Cross-Licensing and Distribution Agreement between Mozido and Appconomy-US, dated December 15, 2014.

By the Loan Agreement, *inter alia*, App-US agreed to: (a) repay the loan no later than November 1, 2015; (b) use the loan proceeds for specified purposes and to provide Mozido with

---

[4] Under Section 2.8 of the Loan Agreement, for purposes of security for the loan, Defendants Papermaster, Magierski, Magierski Family Trust, 10X Capital LLC, and Steven G. Papermaster 2014 Trust ("Collateral Guarantors") granted to Mozido a security interest in the Collateral Guarantors' equity securities in Appconomy Inc. and Appconomy-US "pursuant to that certain Pledge Agreement." These parties are also defined as "Pledgors" under the Pledge Agreement.

certain reports and assurances as to App-US's financial condition and how the proceeds were being used, including quarterly financial reports, and reports describing App-US's intentions regarding use of the loan proceeds; (c) provide Mozido with an option to convert the loan into equity of App-US in the event that it issued equity securities; (d) not incur or assume certain liabilities or debt; and (e) in the event of default, in addition to Mozido's other remedies, grant Mozido a worldwide license to use App-US's products. The Loan Agreement specifically defined certain events of default, including failure to pay principal or interest when due and failure to perform other obligations under the Laon Agreement, after notice and a specified cure period, and granted Mozido various additional remedies for default and failure to cure after notice, including the right to increase the applicable interest rate by 10%.

The loan was secured by shares of App-US and App-Inc., pledged by the Pledgors and set forth in the Pledge Agreement between Mozido, as "Lendor" and the Pledgors, who granted Mozido a security interest in 2.15 million shares of App-Inc. (representing 3.19% of its total common stock) and approximately 1.38 million shares of App-US (representing 23.6% of its series 1 preferred stock). Mozido was led to believe that it was going to obtain collateral, in the form of pledged stock, that would easily exceed the value of its $6.5 million loan. However, the Pledgors never delivered to Mozido the certificates evidencing their ownership of the collateral as they were required to do within 30 days.

As required by the Loan Agreement, Mozido advanced the $6.5 million in proceeds to App-US in two tranches–the first of $3.9 million dollars on November 20, 2014, and the second of $2.6 million dollars on December 16, 2014.

6

On December 31, 2014, Papermaster arranged a conference call that included Liberty, now Mozido's Chairman of Global Strategic Initiatives, Robert Turner, Mozido's executive chairman of the board, Love, the Chief Executive Officer of Mozido, one of Mozido's largest investors, and a person who purported to be Neusoft Chairman and Chief Executive Officer Liu.  During the 55-minute call, and based on Papermaster's representations, members of Mozido on the call believed that the person on the call actually was Liu.  During the call the purported Liu provided assurances regarding Neusoft's intent to do business with Mozido in the future and specifically agreed to provide Mozido with an exclusive contract for business in China.  The Mozido representatives asked during the call for Liu to provide Mozido written assurance that Neusoft would enter into the exclusive contract with Mozido.  Later that day, Papermaster provided Mozido with a "comfort letter" purportedly from Liu.  The letter provided that Neusoft would (1) provide an "equal level of commitment and partnership to Mozido as it had to Appconomy;" (2) "enter into a commercial agreement with Mozido . . . to be the exclusive payment processor and mobile commerce platform partner;" and (3) provide Mozido with access to "Neusoft customers and partners" as well as Chinese markets in "healthcare, Xikang, education, social security, citizen services, transportation, and retail/consumer services."

In early 2015, Love traveled to China with Papermaster on a fact-finding trip.  It was during the trip Love began to discover that Mozido had been lied to about the extent of Appconomy's relationships with Chinese businesses.

In March 2015, Liberty flew to China in an effort to arrange a meeting with Liu, however, Liu refused to meet with Liberty.  Liberty contacted Angela Wang, the chief legal officer for Neusoft. Wang claimed to know nothing about the December 31, 2014 telephone conference call, the comfort

letter, or anything about Mozido or Liberty. Liu and Wang then met with Liberty and assured Liberty that Liu did not participate in any calls or letters. Mozido alleges that the documents were forged, and an imposter participated in the December 31 call posing as Liu. Wang and Liu informed Liberty that Neusoft never agreed to provide Mozido with an exclusive contract and that it was not in a position to do so as it had an existing contract with another company similar to Mozido's business.

Liberty and Love also learned that Alibaba had never offered to acquire Appconomy for $1 billion dollars; rather Alibaba had offered to purchase Neusoft for $1 billion dollars. Further, they learned it was Neusoft, not Appconomy that had the relationship with the Chinese mall developer. They also learned that Appconomy had contracts with only 4 shopping malls in China, not 477 as claimed.

On April 10, 2015, Mozido gave Appconomy-US and the Pledgors demand letters that advised them of various breaches of the Loan and Pledge Agreements. On June 17, 2015, Mozido gave Appconomy-US and the Pledgors notice of continuing defaults and demanded that they cure the defaults as provided for in the Loan Agreement. Mozido alleges that the Pledgors did not deliver the collateral upon default on the loan and to date, Appconomy-US has not repaid the loan.

Mozido filed this action in June 2016 , seeking declaratory and monetary relief, claiming that all Defendants committed federal securities fraud under Section 10(b) of the Federal Securities Exchange Act of 1934 ("Exchange Act"); 15 U.S.C. § 78j(b) & SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("10b-5 claim"). Specifically, the amended complaint alleges that the pledge of Appconomy shares as collateral for Mozido's $6.5 million loan to Appconomy and evidenced by the

8

Pledge Agreement is a purchase and sale of securities.[5]  Mozido also alleges that all Defendants violated the Texas Securities Act[6] and are liable for fraud, fraudulent inducement, negligent misrepresentation, unjust enrichment, and conspiracy.  Additionally, Mozido alleges a breach-of-contract claim against App-US, asserting that App-US breached the Loan Agreement by failing to pay any principal or interest on the loan.  Mozido also alleges breach of contract against Papermaster, Magierski, the Magierski Trust, the Papermaster Trust, and the 10X Capital Trust, asserting breach of the Pledge Agreement.

Mozido asserts that this court has subject-matter jurisdiction over this action.  *See* 28 U.S.C. §§ 1331, 1337, 1367; 15 U.S.C. § 78aa(a) (federal courts "shall have exclusive jurisdiction" over "violations of [the Federal Securities Exchange Act of 1934] or the rules or regulations thereunder").  Additionally, Mozido alleges that consistent with the terms of the forum-selection clauses in the Loan and Pledge Agreements as well as Section 27 of the Securities Exchange Act and federal venue laws, this action is properly before the court.  *See* 15 U.S.C. § 78aa(a); 28 U.S.C. § 1391(b).

In September 2016, all Defendants filed suit in the 98th Judicial District Court of Travis County, Texas, against Mozido, seeking declaratory relief and alleging that they were fraudulently induced into accepting the $6.5 million loan.  *See Appconomy-US v. Mozido, Inc.*, No. D-1-GN-16-004361 (98th Dist. Ct., Travis County, Tex.) ("state-court action").  In the state-court action, Mozido urged the state court to stay the action, pending the outcome of this case, because this action was the

---

[5]  Mozido filed an Amended Complaint on September 20, 2016 (Clerk's Document No. 9).

[6]  *See* Tex. Rev. Civ. Stat. Ann. Arts. 581-1- 581-42 (West 2010).

first filed with a request for similar declaratory relief and in the interest of comity. The state-court denied Mozido's request.

**Defendants' arguments for dismissal**

Defendants move to dismiss Mozido's claim under the Exchange Act, contending that the action is not ripe and deprives this court of its only basis for subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Alternatively, Defendants move to dismiss the entire action, contending that Mozido cannot state a claim under the Exchange Act. *Id.* at 12(b)(6).

Defendants separately move to dismiss the entire action for *forum non conveniens*, noting that this "presents an independent basis for the [c]ourt to dismiss the Amended Complaint." Defendants argue that the Loan Agreement contains a valid and enforceable forum-selection clause that requires the disputes in this action be brought in a Texas state court. *See Atlantic Marine Constr. Co. v. United States Dist. Ct. for the W.D. Tex.*, ____ U.S. ____; 134 S.Ct. 568, 580 (2013) ("the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens").

**Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)**

Defendants contend that Mozido's 10b-5 claim is not ripe, and therefore the court lacks jurisdiction over the claim. *See* Fed. R. Civ. P. 12(b)(1). They argue that because Mozido has not foreclosed on the collateral for the loan, Mozido has no basis in law or fact to assert that the collateral is insufficient to cover Mozido's alleged losses on the loan. Alternatively, Defendants contend that Mozido has not properly stated a 10b-5 claim for which relief may be granted, therefore the claim should be dismissed with prejudice. *See* Fed. R. Civ. P. 12(b)(6).

### *12(b)(1)–ripeness*

Defendants contend that Mozido's claims are not ripe for review because at most Mozido has alleged a possible future injury.

The underlying purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Pacific Gas & Elec. Co. v. State Energy Res. Comm.*, 461 U.S. 190, 200 (1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Defendants argue that Mozido must first exercise its claimed right to foreclose on the pledged securities and sell them in order to determine whether the proceeds are sufficient to cover the alleged loan loses. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994); *Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003); *American Home Mortg. Corp. v. UM Sec. Corp.*, 2007 WL 1074837 (S.D.N.Y. Apr. 9, 2007) (all federal RICO cases). As Mozido has yet taken action to foreclose on the pledged securities, Defendants argue Mozido has no basis in law or fact to assert that the value of the pledged securities is insufficient to cover Mozido's alleged losses on the loan. Defendants argue that because Mozido has not yet suffered a loss or incurred damage, and may never do so, Mozido's 10b-5 claim is not ripe for review.

Mozido responds that its 10b-5 claim is ripe as it has suffered damages in excess of $6.5 million due to the fact that Defendants failed and have refused to deliver the securities at issue to Mozido and that, nevertheless, the securities were worthless.

To properly state a securities-fraud 10b-5 claim, a plaintiff must allege that a particular defendant made: (1) a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff justifiably relied; (5) economic

loss; and (6) loss causation. *DuraPharm., Inc. v. Broudo*, 544 U.S. 336, 341, 42 (2005); *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir. 1977). "The Fifth Circuit determines the sufficiency of the connection according to the liberal 'touch' test, requiring only that the fraud touch or have some discerable connection to the purchase or sale." *Parker v. Hyperdynamics Corp.*, 126 F.Supp. 3d 830, 840-41 (S.D. Tex. 2015) (citing *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)). Further the "in connection with" provision is read flexibly, rather than technically and restrictively. *Id.* at 841. As long as the fraud somehow affects the value of the security, the element will be met. *Id.*

Additionally, a plaintiff's allegations as to a defendant's alleged misrepresentations and scienter must meet heightened standards of particularity. *See* 15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 9(b) ("Rule 9(b)"). A plaintiff must (1) specify each statement alleged to have been misleading; (2) the identity of the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reasons why the statement is fraudulent. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003).

In arguing that Mozido's action is not ripe for review, Defendants rely on caselaw in the RICO context, not the securities-fraud context. "RICO standing is a more rigorous matter than standing under Article III" as it requires clear definite damages before allowing a plaintiff to treble its alleged damages. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). Absent binding precedent, the court declines to extend Defendants' RICO-based ripeness argument to Mozido's 10b-5 claim. The court denies Defendants' motion to dismiss on this ground.

Additionally, the court finds Defendants' contention that the action is not ripe because Mozido has not alleged injury as a result of Defendants' misstatements is unavailing. The amended complaint alleges that Mozido suffered damages in connection with the $6.5 million loan, including the lost value of the shares pledged as collateral for the loan, payments for travel costs to China to learn the truth about the extent of Defendants' Chinese business relationships or lack thereof, fees in connection with Mozido's due diligence which led to the discovery of the fraud, and fees in connection with Mozido's demands that Defendants comply with the terms of the Pledge Agreement. The court concludes that these allegations identify damages that are recoverable under 10b-5 and sufficiently describe Mozido's injury–both out of pocket and consequential in nature. *See e.g., Borneo Energy Sendirian Berhad v. Sustainable Power Corp.*, 646 F.Supp. 2d 860, 869 (S.D. Tex. 2009); *Energytec, Inc. v. Proctor*, 516 F.Supp. 2d 660, 673-74 (N.D. Tex. 2007). The court finds that Mozido has alleged that it acted on Papermaster's and Magierski's false representations and was damaged as a result. The court concludes that it has subject-matter jurisdiction over Mozido's 10b-5 claim and supplemental jurisdiction over Mozido's state-law claims.

### *12(b)(6)–failure to state a claim*

Defendants also move to dismiss the entire action, contending that Mozido cannot state a claim under the Exchange Act against each defendant and therefore the 10b-5 claims should be dismissed for failure to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6). Defendants argue that because the 10b-5 claims are the sole basis for jurisdiction, once the 10b-5 claims are dismissed, the court should also dismiss the remaining state-law claims.

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The court must accept as true "all well-pleaded facts" and view them in the light most favorable to plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Further, the court's task is not to evaluate a plaintiff's likelihood of success, but rather to determine whether the plaintiff has stated a legally cognizable claim that is plausible. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). A claim has facial plausibility where the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the pleadings, the court finds that Mozido has pleaded its fraud claims with particularity. *See* Fed. R. Civ. P. 9(b). Mozido alleges particularly that on July 28, 2014, Michael Liberty, Mozido's founder, met with Papermaster at the Fairmont Miramar Hotel in Santa Monica, California and that then Papermaster represented to Mozido, and again in August 13, 2014 in Mozido's Austin office, Magierski confirmed, multiple specific misrepresentations concerning Appconomy's value and its contacts and contracts in the Chinese marketplace. Also alleged is that on August 12, 2014, Papermaster participated in Mozido's Board of Directors meeting in New York, at the offices of the law firm Sonsini Goodrich & Rosati, where Papermaster made the same misrepresentations as he made at the July 28, 2014 meeting.

Mozido has alleged that "it is more probable than not that defendants' material fraudulent misrepresentations . . . not some external market force . . . caused Mozido to suffer damages when it was revealed that the relevant misrepresentations were untrue." Further, Mozido alleges that it was the "truthful revelations [of defendants' fraudulent misconduct that] significantly and directly caused the depreciation of the value of stock pledged as collateral." *See Dura*, 544 U.S. at 336; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 237 (5th Cir. 2009).

In explaining why Papermaster's and Magierski's representations were fraudulent, Mozido pleads with detail about how Mozido discovered that Papermaster and Magierski had "knowingly fabricated a relationship and partnership with Neusoft and Chinese shopping mall owners" and that Papermaster's and Magierski's statements regarding the value of Appconomy and its stock were untrue. In pleading with particularity, Mozido alleged that Appconomy obtained a $6.5 million loan as a result of the fraudulent conduct, which further benefitted Papermaster, Magierski, 10X Capital, and the trusts as stock owners. Mozido has also pleaded that all statements by Papermaster and Magierski were made in their individual capacity, and "acting on behalf of and as an employee, director, representative, [and] agent . . . of App-Inc., App-US, Neuano, Magierski Trust, 10X Capital and/or the Papermaster Trust." Mozido also pleaded that Defendants' fraudulent representations were "made in furtherance of the interest of App-Inc., App-US, Neuano, Magierski Trust, 10X Capital and/or the Papermaster Trust. Mozido contends that it thereby alleged and imputed Papermaster and Magierski's statements on the company under the doctrine of *respondeat superior*. *See Southland Secs. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365-66, 380 (5th Cir. 2004) (imputing fraudulent statements made by corporate officer to corporate entity when statements made on behalf of, and in course of one's employment with corporate entity).

In summary, Mozido specifically alleges that it made an investment in Appconomy justifiably relying on fraudulent misrepresentations by Papermaster and Magierski concerning Appconomy's alleged business relationships and the value derived therefrom. Mozido learned of the misrepresentations and untruths through Liberty's post-loan meeting with Liu and Wang. Mozido's investment in Appconomy was worth far less than Mozido invested because Papermaster's and Magierski's representations about Appconomy's business relationships were false. Mozido has

adequately pleaded loss causation by alleging that all damages were a "foreseeable and proximate result of defendants' wrongful conduct," and it is "more probable than not that defendants' material fraudulent misrepresentations concerning its connections with the Chinese market and the value derived from those connections–not some external market force–caused Mozido to suffer damages[.]" Mozido bases its proof of loss on Appconomy's apparent insolvency, as shown by its failure to pay any interest or principal on the note. *See e.g., Carlucci v. Han*, 907 F. Supp. 2d 709, 725-26 (E.D. Va. 2012) (refusing to dismiss private securities action where plaintiff "cites the nonpayment of [a convertible promissory note], under which [defendant] was obligated to repay . . . as evincing economic loss" and plaintiff alleged that "because [defendant's] representations . . . were false, [plaintiff's] investment was worth far less than [the money] he invested and that the investments were now likely worthless.")

Mozido asserts that it has properly alleged its 10b-5 claims against each of the Defendants by alleging that Papermaster and Magierski were acting in their scope as employees, directors, representatives, or agents controlled by and with authority to act on behalf of and bind all Defendants when the misrepresentations were made. *See Southland Secs. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365-66, 380 (5th Cir. 2004). In determining whether a corporate defendant made fraudulent statements and acted with the requisite scienter, courts look to "the state of mind of the individual corporate official or officials who make or issue the statement." *Southland*, 365 F.3d at 366. Here, Papermaster and Magierski are the principal owners and executive officers of Appconomy; Papermaster and Magierski were agents and controlled 10X Capital and the trusts; at all relevant times, Papermaster and Magierski presented themselves as employees, directors, officers, representatives, or agents of Appconomy, as authorized by Appconomy to engage in negotiations

with Mozido and bind Appconomy; and each statement made by Papermaster and Magierski was made on behalf of and in furtherance of the interests of the Appconomy entities, 10X Capital, and the trusts. *See e.g., Lee v. Active Power, Inc.*, 39 F.Supp. 3d 876, 882 (W.D. Tex. 2014) (high-level employee's fraudulent statements and scienter imputed to his employer because the employee was (1) high-level employee; (2) acting within scope of employment; and (3) authorized to act on behalf of employer).

The court concludes that Mozido has stated 10b-5 claims against Defendants which, if proved, provide a basis for relief. The court will deny Defendants' motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6).

**Defendants' motion to dismiss for *forum non conveniens***

Defendants contend that the Loan Agreement, which includes a valid, enforceable forum-selection clause that requires any litigation among the parties to be brought in Texas state courts, controls the venue of this action. Mozido responds that the Pledge Agreement, which contains a forum-selection clause that explicitly provides for "jurisdiction" in the Western District of Texas and includes a waiver-of-venue clause by which the parties explicitly waive the defense of an inconvenient forum in any action concerning the Pledge Agreement "or any other loan document," controls venue in this action. Further, Mozido argues that the Pledge Agreement binds signatories and nonsignatories because the Pledge Agreement is incorporated by reference into the Loan Agreement and it is foreseeable to the nonsignatories that they would be bound by its terms because they are closely related to the agreement and benefitted directly thereunder.

17

**Venue provisions in the agreements**

The Loan Agreement, with Mozido and Appconomy-US as parties, and with each of the

Defendants signing as Collateral Guarantors, provides,

> 10.4 <u>Forum.</u>  Any Litigation among the parties arising out of or
> relating to this Loan Agreement or the transactions contemplated by
> this Loan Agreement shall be brought in the courts of the State of
> Texas.    Each party irrevocably unconditionally, and absolutely
> submits to the jurisdiction of such courts, and each Party irrevocably,
> unconditionally, and absolutely submits to the jurisdiction of such
> courts, and each Party, irrevocably, unconditionally, and absolutely
> waives any objection to venue or to convenience of forum.[7]

The Pledge Agreement, signed by each of the Defendants as a "Pledgor," and who each

signed as a Collateral Guarantor under the Loan Agreement, provides,

> Section 18(b) <u>Submission to Jurisdiction.</u>  Each Pledgor irrevocably
> and unconditionally submits, for itself and its property, to the
> nonexclusive jurisdiction of the courts of the State of Texas sitting in
> Travis County and of the United States District Court of the Western
> District of Texas, and any appellate court from any thereof, in any
> action or proceeding arising out of or relating to this agreement or any
> other document, or for recognition or enforcement of any judgment,
> and each of the parties hereto irrevocably and unconditionally agrees
> that all claims in respect of any such action or proceeding may be
> heard and determined in such Texas State Court or, to the fullest
> extent permitted by applicable law, in such federal court. Each of the
> parties hereto agrees that a final judgment in any such action or
> proceeding shall be conclusive and may be enforced in other
> jurisdictions by suit on the judgment or in any other manner provided
> by law.  Nothing in this agreement or in any other document shall
> affect any right that the lender may otherwise have to bring any action

---

[7] "Litigation" is defined by the Loan Agreement to "mean and refer to any pending or threatened lawsuit, action, cause of action, claim for relief, case, contest, mediation, arbitration, investigation, audit, or other legal, equitable, or administrative proceeding of any kind, character, or description." "Loan Agreement" is defined by the Loan Agreement to "collectively mean and refer to this Loan Agreement, the Exhibits, if any, and any amendments executed and delivered by the Parties."

> or proceeding relating to this agreement or any other document against each Pledgor or its properties in the courts of any jurisdiction.

Additionally, the Pledge Agreement includes,

> Section 18(c) <u>Waiver of Venue.</u> Each Pledgor irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this agreement or any other loan document in any court referred to in paragraph (b) of this section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**The law**

*Forum non conveniens* provides for the dismissal of a case in an otherwise appropriate court so that the case might be litigated in another, more convenient, forum. *Atlantic Marine*, 134 S.Ct. at 580. As clarified in *Atlantic Marine*, the venue-transfer statute, "is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Id.* (discussing 28 U.S.C. § 1404(a)) ("Section 1404(a)").

As *Atlantic Marine* established that the appropriate procedural vehicle for forum-selection clause enforcement is Section 1404(a), the next analysis is whether, if at all, a forum-selection clause alters the traditional Section 1404(a) analysis. That traditional analysis requires courts to "weigh relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote the 'interest of justice.'" *Id.* at 581. *Atlantic Marine* holds that the calculus changes "when the parties' contract contains a valid forum selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Id.* (quoting *Stewart Org., Inc. v.*

19

*Ricoh Corp.*, 487 U.S. 22, 31 (1988) (Kennedy, J., concurring)). In these circumstances, the Court concluded, a proper application of Section 1404(a) requires that a forum-selection clause be "given controlling weight in all but the most exceptional cases." *Id.* at 579.

"The presence of a valid forum-selection clause requires the district courts to adjust their usual Section 1404(a) analysis in three ways." *Id.* at 581. "First, the plaintiff's choice of forum merits no weight." *Id.* at 581-82. Second, "arguments about the parties' private interests" are not to be evaluated; only "arguments about public-interest factors" may be considered in applying *Atlantic Marine's* Section 1404(a) analysis. Third, "a Section 1404(a) transfer of venue will not carry with it the original venue's choice of law rules–a factor that in some circumstances may affect public-interest considerations." *Id.* at 582.

In conclusion, the *Atlantic Marine* court summarized, "the party acting in violation of the forum-selection clause . . . must bear the burden of showing that public-interest factors overwhelmingly disfavor transfer." *Id.* This harmonizes with the Supreme Court's guidance that contractually selected forums often "figure[] centrally in the parties' negotiations" and become part of those parties' "settled expectations"–so if a plaintiff disregards such a contractual commitment, "dismissal . . . work[s] no injustice." *Id.* at 583 & n. 8.

Federal law applies to determine the enforceability of forum-selection clauses in federal-question cases. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016). A court must use the forum's choice-of-law rules to determine what substantive law governs when interpreting the meaning and scope of a forum-selection clause. *Id.*

Both the Loan Agreement and the Pledge Agreement provide that Delaware law shall govern the contracts. Here, as Texas is the forum, "Texas law gives effect to choice of law clauses regarding

construction of a contract," thus, Delaware law applies to questions of substantive contract law and

the interpretation of the scope and meaning of the forum-selection clauses. *Benchmark Elecs., Inc.*

*v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003).

When interpreting contractual forum-selection clauses courts are to "give effect to the intent

of the parties as manifested by the language of the contract." *Kier Constr. Ltd. v. Raytheon Co.*,

2005 WL 628498, at *5 (Del. Ch. March 10, 2004).

**Analysis**

No party contends that any venue-related provision in either agreement is invalid.  Based on

the plain language of the Pledge Agreement, regarding the pledged collateral, the parties negotiated

specifically for the ability to bring claims in both federal and state forums in Texas.  The court finds

that the Pledge Agreement's language more narrowly defines the parties' intent with regard to the

pledged collateral.  *Kier Constr., Ltd.*, 2005 WL 628498, at *5.  Further, under the Pledge

Agreement, Defendants explicitly waived any right to challenge venue in this court based on *forum*

*non conveniens*.

The court finds and concludes that the Pledge Agreement is the central basis for Mozido's

claims for breach of contract, declaratory judgment, fraudulent inducement, and securities fraud

regarding the $6.5 million dollar loan.  Further, the Pledge Agreement contains an explicit forum-

selection clause, providing for jurisdiction in this court–not simply venue–and includes a waiver-of-

venue clause that explicitly waives challenges to venue or inconvenient forum in any action

concerning the Pledge Agreement. The court will deny Defendants motion to dismiss for *forum non*

*conveniens*.

**Conclusion**

Having considered the motions, responses, replies, the parties' letter briefs submitted after the hearing, the case file, the arguments of counsel, and the applicable law the court will deny the motions.

**IT IS ORDERED** that Defendants' Rule 12(b)(1) and 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Brief in Support filed October 4, 2016 (Clerk's Document No. 11) and Defendants' Motion to Dismiss Plaintiff's Amended Complaint for *Forum Non Conveniens* and Brief in Support filed November 9, 2016 (Clerk's Document No. 18) are **DENIED**.

SIGNED this 14th day of August, 2017.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE